**Hamed Elsyed ELNAGER, Petitioner,**

v.

**U.S. IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 89–70207.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 8, 1990.

Decided April 19, 1991.

John Stephen Glaser, Manulkin, Glaser & Bennett, Fountain Valley, Cal., for petitioner.

David J. Kline, Office of Immigration Litigation, Washington, D.C., for respondent.

Before HUG, CANBY and WIGGINS, Circuit Judges.

WIGGINS, Circuit Judge:

Hamed Elnager, a native and citizen of Egypt, appeals the Board of Immigration Appeals (the "BIA") denial of asylum and withholding of deportation relief. He contends that the BIA applied the incorrect legal standard to his asylum petition and that the decision was not supported by substantial evidence. We AFFIRM the decision of the BIA.

## BACKGROUND

Petitioner Hamed Elsyed Elnager is a 36–year–old native and citizen of Egypt. He was admitted to the United States on October 28, 1982, under a visitation visa which authorized him to remain in the United States until November 30, 1982. Elnager failed to leave the United States prior to the expiration of his visa, and he remains in this country.

The Immigration and Naturalization Service initiated deportation proceedings with the issuance of an Order to Show Cause on February 18, 1983. The Order charged Elnager with being deportable under § 241(a)(2) of the Immigration and Nationality Act (the "Act"), 8 U.S.C. § 1251(a)(2), because he remained in the United States longer than permitted. After an extended continuance, Elnager's deportation proceeding commenced on December 3, 1984. Elnager, represented by counsel, admitted the allegations contained in the Order to Show Cause and conceded his eligibility for deportation. The Immigration Judge designated Egypt as the country of deportation.

Elnager then applied for deportation relief under the asylum and withholding of deportation provisions of the Act. He alleged a fear of religious persecution in Egypt. Elnager was a Moslem until 1979 when he converted to Christianity. Conversion to another religion is an act condemned by the Koran and is punishable by death. Witnesses, appearing for Elnager, testified concerning the probable persecution of Elnager in Egypt. Approximately 20% of Egypt's population is Christian.

Despite his alleged fear of persecution, Elnager attended Christian services in Egypt from 1973 to 1982. He attended church away from his community to avoid having his faith recognized. His family is devoutly Moslem, and a cousin is a member of a radical Moslem group. When confronted by his cousin about attending Christian services, Elnager lied to conceal his conversion.

Elnager was married to his present wife, Georgette Bagdadi, in England in 1982. He and Bagdadi now reside in Las Vegas, Nevada and have two children who are citizens of the United States. When Elnager first came to the United States, he married Marilyn Simpson, a United States citizen. Elnager never lived with Simpson, and the marriage was apparently solely an

attempt to obtain a United States visa.[1] Elnager's marriage to Simpson may have been bigamous, as he had married Bagdadi prior to coming to the United States.[2]

The immigration judge denied Elnager's petition for asylum and withholding of deportation. The judge found that Elnager had failed to demonstrate that he would be subjected to persecution in Egypt. Elnager appealed to the BIA which found that Elnager had failed to show either a clear probability or a well-founded fear of persecution. The BIA dismissed the appeal on April 11, 1989, and Elnager filed the petition for review with this court. Eight months after the BIA's dismissal and six months after filing his petition for review, Elnager filed a motion to reopen with the BIA. That motion was denied on January 10, 1991.

## DISCUSSION

### A

■ Elnager applied for both asylum and a withholding of deportation. These claims are analyzed under different legal standards. To be eligible for a discretionary grant of United States asylum under § 208(a) of the Act, an alien must be a "refugee". 8 U.S.C. § 1158(a). A refugee is defined as:

> any person who is outside any country of such person's nationality ... who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion

·   ·   ·   ·   ·

8 U.S.C. § 1101(a)(42)(A). An alien's well-founded fear must be both genuine and objectively reasonable. *Zacarias v. U.S. INS*, 908 F.2d 1452, 1455 (9th Cir.1990).

■ To be granted a withholding of deportation under § 243(h) of the Act, the Attorney General must determine, "that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1253(h). Section 243(h) requires a showing of facts which indicate a "clear probability" of persecution, meaning that it is more likely than not that the alien will suffer persecution. *Zacarias*, 908 F.2d at 1455; *Sarvia–Quintanilla v. INS*, 767 F.2d 1387, 1392 (9th Cir.1985).

■ The difference between the well-founded fear and clear probability standards has been the subject of recent court decisions. Although most courts have not defined the well-founded fear standard, it is clear that it is "more generous" than the clear probability of persecution standard. *Bolanos–Hernandez v. INS*, 767 F.2d 1277, 1282 (9th Cir.1984) (agreeing with an assumption made in *INS v. Stevic*, 467 U.S. 407, 425, 104 S.Ct. 2489, 2498, 81 L.Ed.2d 321 (1984)). The more liberal element of the well-founded fear standard is, at least in part, a subjective analysis which includes consideration of the applicant's state of mind. *Bolanos–Hernandez*, 767 F.2d at 1283, n. 11. To interpret the well-founded fear standard, the INS has applied a "reasonable man" standard to asylum cases. *Matter of Mogharrabi*, No. 3028, Int.Dec. at 9 (BIA, June 12, 1987).

Petitioner Elnager argues that the immigration judge in his case applied the incorrect standard in rejecting his application for asylum. Indeed, the immigration judge did not distinguish between the two standards in his opinion. Elnager points to the reasoning employed by the judge, who stated, "It is the burden of the respondent to show that he *will* be subjected to persecu-

---

**1.** Simpson, by written statement, declared that she married Elnager as a "favor" to a friend. She first filed, then withdrew an application for a United States visa for Elnager. The BIA found that, "It is clear that [Elnager's] marriage was intended to gain him immigration benefits."

**2.** There was evidence that Bagdadi had signed a divorce paper under coercion while she was back in Egypt. However, the BIA held that the record was "inadequate" to determine if Elnager's "marriage to a United States citizen [was] subsequent to a valid Egyptian divorce."

tion." (emphasis added). Elnager's position is well-taken, as this language seems to indicate that the immigration judge incorrectly applied the heightened clear probability standard to both the asylum and withholding of deportation issues.

However, this court's review is limited to the decision of the BIA, *Rodriguez–Rivera v. INS*, 848 F.2d 998, 1002 (9th Cir.1988), *Quintanilla–Ticas v. INS*, 783 F.2d 955, 957 (9th Cir.1986), and the BIA has the power to conduct a de novo review of the record, to make its own findings, and independently to determine the legal sufficiency of the evidence. *Cardoza–Fonseca v. INS*, 767 F.2d 1448, 1455 (9th Cir.1985), *aff'd*, 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). Therefore, the error made by the immigration judge in applying the standards may be rendered harmless. *See Rodriguez–Rivera v. INS*, 848 F.2d at 1002; *Quintanilla–Ticas*, 783 F.2d at 957.

In the instant case, the BIA applied the correct legal standard. The BIA's decision makes clear that it was cognizant of the difference between the standards and that it applied the well-founded fear standard in determining Elnager's refugee status. The Board explained the asylum and withholding standards in separate, consecutive paragraphs. It cited *INS v. Cardoza–Fonseca*, 480 U.S. 421, 446–48, 107 S.Ct. 1207, 1221–22, 94 L.Ed.2d 434 (1987), which held that the asylum and withholding standards are different. Additionally, the BIA stated that the asylum standard required a showing "that a reasonable person in [the petitioner's] circumstances" would fear persecution, whereas, the withholding of deportation, clear probability standard, required a "showing that it is more likely than not an alien would be subject to persecution."

Because our review is limited to the decision of the BIA and the BIA applied the correct legal standards to Elnager's case, we find no error.

### B

■ Elnager contends that the BIA should have remanded the case to the immigration judge for a rehearing under the correct legal standard. He asks this court to require remand as a matter of procedure whenever the immigration judge misapplies the standards.

As stated, the BIA has the power to make independent determinations regarding the legal sufficiency of evidence. *Cardoza–Fonseca*, 767 F.2d at 1455. The appropriate regulation provides that the "Board shall exercise such discretion and authority conferred upon the Attorney General by law as is appropriate and necessary for the disposition of the case." 8 C.F.R. § 3.1(d). Any requirement that the BIA remand a case in which the immigration judge has applied the wrong legal standard would strip the BIA of the discretion that this rule provides. The BIA has the power to apply the correct standard regardless of the law applied by the immigration judge. Although the BIA has the discretionary power to remand a case, 8 C.F.R. § 3.1(d)(2), the federal regulations and case law do not require that it do so.

The most compelling argument in favor of the rule Elnager proposes is that the BIA may have an insufficient record to apply the correct legal standard. In the instant case, the immigration judge failed to recognize the more liberal nature of the well-founded fear standard. As stated, that standard includes subjective evidence of the petitioner's fears. Therefore, in a given case, the record may not contain sufficient evidence for the BIA to apply the correct legal standard. However, there is no reason to believe that the BIA is incapable of making an independent determination regarding the sufficiency of the record, or that its determination in this case constituted an abuse of its discretion.

The immigration judge did not preclude Elnager from introducing sufficient subjective evidence. The judge did not significantly interrupt Elnager's testimony in which he alleged fears of his family and of radical Moslems. Elnager indicated that he "was scared to change his name to [a] Christian name" while in Egypt. In Elnager's own words, he would have a "hard time" returning to Egypt, and he believed that he "[could not] leave the airport safe."

Near the conclusion of his direct questioning, Elnager's attorney asked him, "Is there anything else you would like to tell the court today as to why it is you are afraid to return to Egypt?" In response, Elnager reiterated his fear that it would be "hard for him" and that "probably he [would] be killed."

We refuse to adopt Elnager's proposed procedural rule. The BIA has the independent power to apply the correct legal standard, and the record contained sufficient information for the BIA to do so.

## C

█ Elnager argues that the BIA should give notice to the petitioner when it plans to conduct a de novo review of the case. Elnager asks this court to adopt such a rule as a matter of procedure to ensure that the petitioner presents all material evidence.

However, Elnager was clearly on constructive notice as to the BIA's power to conduct a de novo review, and no court has ever held additional notice necessary. Elnager's brief before the BIA, which explains the different legal standards and reargues the case's merits, shows that Elnager recognized the BIA's ability to conduct a de novo review. Additionally, the law giving independent power to the BIA to decide a case was clear and available to petitioner. Elnager never claims that he was unaware of the BIA's broad decision making power. We therefore refuse to adopt Elnager's proposed procedural rule.

## D

█ Elnager contends that the BIA's conclusion that he failed to demonstrate a well-founded fear of persecution is not supported by the evidence. In support of his argument, he points to alleged persecution of religious converts by radical Moslem groups in Egypt. Whether an alien has established a well-founded fear of persecution is reviewed for substantial evidence. *Bolanos–Hernandez,* 767 F.2d at 1282, n. 9.

█ A well-founded fear can exist where there is a less than 50% chance of persecution. *Cardoza–Fonseca,* 480 U.S. at 431, 107 S.Ct. at 1213 (court indicating that even a 10% chance of death may give rise to a well-founded fear). The feared persecution must come from either the government or a group the government is unable to control. *See Rodriguez–Rivera,* 848 F.2d at 1005 (involving alleged fear of political persecution). As stated, the fear of persecution must be objectively reasonable. *Zacarias,* 908 F.2d at 1455.

█ Elnager failed to provide sufficient evidence that he has a well-founded fear of persecution from a group the government is unable to control. He claims that the Muslim Brotherhood, a radical Moslem group, would harm him if he returns to Egypt. Because of the extreme fanatic nature of this group, Elnager alleges that the Egyptian government is incapable of controlling it. However, the only factual evidence he offered was the assassination of Anwar Sadat by the Muslim Brotherhood. Sadat's position in the Egyptian government clearly distinguishes that situation from anything facing Elnager. Further, the fact that Sadat's assassins were caught and punished by the Egyptian government shows that the government controls the Brotherhood.

Elnager's witnesses presented no solid evidence in support of a well-founded fear. Only three of his witnesses had been to Egypt, two of whom were his wife and father-in-law. No witness testified about actual persecution to individuals, and most simply related what they believed to be the general religious climate in Egypt. Elnager's own testimony displays little more than the fact that religious converts in Egypt may have a "hard time". Indeed, Elnager attended Christian services in Egypt for nine years without harm. Further, the immigration judge found Elnager lacking in credibility, due largely to his fraudulent and potentially bigamous marriage.[3] The BIA seemed to agree with the

---

**3.** The judge noted:

The fact that the respondent was willing to

enter into a relationship with a citizen of the

credibility conclusions of the immigration judge. However, because no substantial evidence supported a well-founded fear, the BIA found it unnecessary to reach credibility issues.

Substantial evidence supported the BIA's conclusion that the government of Egypt does not participate in the persecution of religious converts, and further, that it takes steps to control such persecution. The Bureau of Human Rights and Humanitarian Affairs (the "BHRHA") report concluded that Elnager, as a convert, was not subject to "government inspired or tolerated" persecution, and that "[f]ull judicial and administrative remedies exist in Egypt and the Government goes to considerable effort to ensure that violence or the threat of violence against Christians—converts or otherwise—does not occur." [4]

In sum, Elnager failed to make a showing of a well-founded fear of persecution in Egypt. Elnager may be estranged from his family and may have a difficult time within the Egyptian culture because of his conversion, but the evidence failed to display an objectively reasonable well-founded fear of actual persecution.

Since the well-founded fear standard is more liberal than the clear probability standard, a failure to prove it necessarily means a failure to prove eligibility for a withholding of deportation. *Rodriguez–Rivera*, 848 F.2d at 1007. Therefore, Elnager's claim that he satisfied the clear probability standard and is entitled to a withholding of deportation also fails.

United States for the purpose of obtaining a visa to remain in the United States convinces me that the respondent would do anything available to him to remain in this country, and that includes misrepresentation in this proceeding. I, therefore, consider that he is not a creditable witness, and I place very little credible faith in his testimony.

4. The full BHRHA opinion reads:

There is no penalty in Egypt for conversion from Islam to Christianity. This is not now the law in Egypt and we see little prospect that it will become law in the foreseeable future. Converts to Christianity do not face government inspired or tolerated threats to

## CONCLUSION

We AFFIRM the decision of the BIA.

their life or freedom. There is no tradition in Egypt under Islamic or any other law that converts to Christianity may be put to death, physically beaten, or otherwise denied 'life opportunities.' Indeed, there is a substantial tradition of tolerance for religious minorities and for religious conversion. The Mubarak Government has succeeded in greatly reducing sectarian tension which flared up in 1981. We are aware of no reports of attacks on Christians or converts having occurred since late 1981. Full judicial and administrative remedies exist in Egypt and the Government goes to considerable effort to ensure that violence or the threat of violence against Christians—converts or otherwise—does not occur.