34 F.3d 1073
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Edward Farid MORGAN, Petitioner,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent.
 No. 92-70818.
 United States Court of Appeals, Ninth Circuit.
 Submitted June 8, 1994.*
Decided Aug. 29, 1994.
 
 Before: FLETCHER, CANBY, and HALL, Circuit Judges.
 
 
 1
 MEMORANDUM**
 
 
 2
 Edward Farid Morgan appeals a decision of the Board of Immigration Appeals ("BIA"), denying his requests for asylum and withholding of deportation. He challenges the BIA's findings that he has not established a well-founded fear of persecution in Egypt, and that the persecution he suffered in the past was not so severe as to warrant asylum for humane reasons. Morgan also argues he is entitled to voluntary departure.
 
 
 3
 We have jurisdiction to consider Morgan's appeal pursuant to 8 U.S.C. Sec. 1105(a). We affirm the BIA's denial of asylum and withholding of deportation, but remand with instructions that Morgan's request for voluntary departure be briefed by the parties and ruled upon by the BIA.
 
 FACTS AND PROCEDURAL HISTORY
 
 4
 Morgan is a 42 year old Egyptian citizen and a member of the Coptic Orthodox Church, a minority religion in Egypt. He entered the United States on a visitor's visa on January 7, 1982, overstayed, and applied for asylum.
 
 
 5
 Morgan testified that in 1972 he was watching a protest involving other Coptic students and was arrested by police. He was jailed without explanation, questioned about his religious views, and beaten three times, resulting in broken bones and scars which are visible to this day. After twenty days, he was taken from jail and dropped off in the vicinity of his home.
 
 
 6
 Thereafter, Morgan graduated from Ain Shams University (1975) and the American University (1977) with degrees in Accounting and Computer Programming. He soon found a job with TWA, which he kept until coming to the United States in 1982.
 
 
 7
 In 1981, about a month before coming to the United States, Morgan was allegedly accosted in the street by Islamic fundamentalists who verbally harassed and physically attacked him because he was Christian. He ran into his apartment, and the attackers threw rocks through his window. Two or three days later, a crucifix-like sign was put on his door, which he claims was a signal that an attack against him was in preparation.
 
 
 8
 About one week before his departure, Morgan was allegedly harassed by a Saudi Arabian police officer who, like Morgan, worked at the airport. The officer said he would cut Morgan's throat because Morgan was a Christian. Morgan's friends from TWA helped him out of this altercation, and drove him home.
 
 
 9
 Morgan applied for asylum on April 25, 1983, about one year after his tourist visa had expired. His application was denied, and he was granted voluntary departure, on November 10, 1983. He did not leave. A Show Cause order was filed against him on January 18, 1984. At a hearing before an Immigration Judge (IJ), he conceded deportability and renewed his requests for asylum and voluntary departure.
 
 
 10
 The State Department concluded in its advisory letter that Morgan had not established a well-founded fear of persecution. The letter claimed that Copts have full constitutional protections in Egypt, and that they can seek legal protection and redress for any individual acts of harassment by Islamic fundamentalists. The letter stated "there is no evidence of officially inspired or sanctioned acts of discrimination against Copts." AR 81. The letter also noted that in 1981 (just prior to Morgan's departure) religious tensions came to a head in Egypt, resulting in violence by both Islamic and Coptic extremists. The letter concluded that "passions have cooled," and "[d]omestic calm has in large part been restored to Egypt." Id.
 
 
 11
 The IJ issued its oral decision on August 10, 1987. It found that Morgan had failed to establish a well-founded fear of persecution in Egypt, and was therefore ineligible for asylum or withholding of deportation. The IJ also denied Morgan's request for voluntary departure.
 
 
 12
 Morgan filed a notice of appeal to the BIA, in which he challenged the IJ's decisions regarding asylum, withholding of deportation, and voluntary departure. On October 13, 1989, he filed a brief in support of his appeal, which argued the former two issues at some length, but nowhere mentioned voluntary departure.
 
 
 13
 On October 29, 1992, the BIA issued its opinion, denying Morgan asylum and withholding of deportation. The BIA cited the State Department letter for the proposition that "[a]lthough individual acts of discrimination against Copts has [sic] occurred, domestic calm has in large part been restored to Egypt." AR 4. The BIA found that Morgan's harassment by the Saudi police officer and the Islamic stone-throwers were "random acts of individuals," and that Morgan had failed to establish that the Egyptian authorities were unwilling to help him in such circumstances. AR 5. The BIA also found that Islamic hostility toward Copts did not constitute a proper basis for asylum because it was not "directed or condoned" by the Egyptian government. AR 4. The BIA also rejected Morgan's claim that he qualified for asylum based on past persecution alone. Finally, the BIA neither mentioned nor ruled upon Morgan's request for voluntary departure.
 
 DISCUSSION
 I. Asylum and Withholding of Deportation
 
 14
 We review the BIA's denial of asylum for an abuse of discretion, Acewicz v. INS, 984 F.2d 1056, 1061 (9th Cir.1993), and its underlying factual findings, such as whether Morgan has established a well-founded fear of persecution, for substantial evidence. Abedini v. INS, 971 F.2d 188, 190 (9th Cir.1992); see INS v. Elias-Zacarias, 112 S.Ct. 812, 815 (1992).
 
 A.
 
 15
 In Elnager v. INS, 930 F.2d 784, 788 (9th Cir.1991), we found that Egypt is a secular state which does not sanction Islamic hostility toward Christians. We think Elnager is dispositive of Morgan's claim. Elnager was an Egyptian citizen who converted to Christianity in 1979 (he had attended Christian services since 1973, however). Id. at 785. Like Morgan, he entered the United States on a visitor's visa in 1982, overstayed, conceded deportability, and applied for asylum and withholding of deportation. Id. And like Morgan, he based his claim on fear of religious persecution by Islamic militants. Id. We affirmed the BIA's determination that Elnager had not established a well-founded fear of persecution on this basis, finding that Muslim harassment of Christians was not government-sanctioned, and that the government was capable of controlling it. Id. at 788 (citing Rodriquez-Rivera v. INS, 848 F.2d 998, 1005 (9th Cir.1988) for the proposition that the "feared persecution must come from either the government or a group the government is unable to control"); see also Desir v. Ilchert, 840 F.2d 723, 728 n. 5 (9th Cir.1988) (same). We relied on a State Department letter much like the one in Morgan's case, which reported that Christians in Egypt do not face "government inspired or tolerated threats," that Christians have recourse to "full judicial and administrative remedies" if harassed, and that the Egyptian government had pacified "the sectarian tension which flared up in 1981." Id. at 789 n. 4 and accompanying text.
 
 
 16
 Elnager held that "the government of Egypt does not participate in the persecution of [Christians], and further ... it takes steps to control such persecution." Id. at 789. Therefore, Egyptian Christians are not entitled to asylum based on their religion alone, absent some specific evidence of persecution the government either condones or is unable to control. See also Yacoub v. INS, 999 F.2d 1296, 1297-98 (8th Cir.1993) (in case where Egyptian Christian sought asylum, court held that petitioner "has not shown the Egyptian government persecuted him or is unable to control the Muslim majority," and affirmed BIA's denial of asylum request). Morgan has not provided any such evidence.
 
 
 17
 Morgan credibly claimed at his hearing that in 1972 Egyptian authorities wrongfully imprisoned him, interrogated him about his religion, and beat him severely. However, he points to no further persecution during the ten years following that episode. Instead, he continued at school, graduated with a technical degree, and secured a job which he liked very much. Because of his employment with TWA, he periodically travelled abroad (at least twice to the United States), but never sought asylum. We thus find substantial support for the conclusions that the 1972 incident was not part of a pattern of continuing harassment of Morgan, and that he did not think of it as such.
 
 
 18
 Morgan also credibly claimed to have been accosted by Islamic extremists who harassed him, threw stones through his windows, and put a cross mark on his door. He claimed the cross was a sign a further attack on his apartment was in preparation. However, no attack occurred during the three or four weeks between this incident and his departure from Egypt; since that time, twelve years have passed. There is substantial evidence to support the BIA's conclusion that this incident, as well as the altercation with a Saudi police officer at the airport, were the "random acts of individuals." There is no evidence to indicate that Morgan has been "targeted" for further attacks from which the authorities will be unable to protect him, nor that, when he left Egypt, he feared he was targeted. By his own account, he left Egypt for a short vacation to the United States, and acquaintances here convinced him to stay and apply for asylum.[1]
 
 B.
 
 19
 Morgan also argues that he should be granted asylum based on past persecution alone. We have held that
 
 
 20
 [t]he BIA may grant asylum for humanitarian reasons, where an applicant or his family has suffered " 'under atrocious forms of persecution,' " even where there is little likelihood of future persecution.
 
 
 21
 Acewicz, 984 F.2d at 1062 (quoting Matter of Chen, Int.Dec. 3104 (BIA 1989)). In Chen, the BIA granted asylum to a young Chinese Christian who had been beaten, tortured, starved, and imprisoned since the age of 8. Although he had not established a likelihood of future persecution, the BIA decided that it would be "inhumane" to require him to return to China. In Desir we found an alien eligible for asylum based on past persecution alone. 840 F.2d at 729. The Haitian petitioner there had on several occasions been beaten, imprisoned, assaulted and extorted by government security forces (the "Ton Ton Macoutes"). Id. at 724-25.
 
 
 22
 The persecution alleged by Morgan does not approach that experienced by the petitioners in Chen or Desir. The most serious incident he alleges is the imprisonment and beating by police in 1972--ten years before he left the country. There is no basis for concluding that it would be "inhumane" to send him back to Egypt because of the past persecution he suffered there.
 
 II. Voluntary Departure
 
 23
 Morgan claims he is entitled, at the least, to voluntary departure. "Voluntary departure avoids the stigma of deportation, enables the applicant to select his own destination, and, most importantly, facilitates the possibility of return to the United States." Tzantarmas v. United States, 402 F.2d 163, 165 n. 1 (9th Cir.1968), cert. denied, 394 U.S. 966 (1969). An alien is eligible for voluntary departure if he or she can show "good moral character" for the preceding five years. 8 U.S.C. Sec. 1254(e). Eligible aliens may be granted voluntary departure by the INS on a discretionary basis. Mabugat v. INS, 937 F.2d 426 (9th Cir.1991).
 
 
 24
 When Morgan's asylum application was denied by an immigration officer on November 10, 1983, he was granted voluntary departure. His renewed request for voluntary departure, however, was denied by the IJ in summary fashion:
 
 
 25
 respondent requested voluntary departure; however, he has not qualified himself for that relief either. I don't even know if he would leave if given the opportunity to do so. He has not otherwise qualified for such relief. As such, I do not find that I would grant such relief to him and I will order his deportation to the country of Egypt.
 
 
 26
 AR 44. Morgan, in his notice of appeal to the BIA, claimed that the IJ's ruling was "arbitrary and capricious." AR 20. In his brief to the BIA, however, he never mentioned voluntary departure. The BIA's opinion neither mentioned nor ruled upon his request for voluntary departure.
 
 
 27
 The INS now contends that Morgan's failure to specify his reasons for assigning error to the IJ's denial of voluntary departure "acted as a waiver, depriving the Board of the notice it needed to properly exercise its role before the issue was raised before the judiciary." Red Brief at 21-22. The INS notes that where an issue raised in the notice of appeal but not briefed does not meet the BIA's specificity requirements, the BIA may summarily dismiss it under 8 CFR Sec. 3.1(d)(1-a)(i).
 
 However, we recently held that
 
 28
 the concatenation of [the Notice of Appeal form's instructions], the BIA's strict Notice of Appeal requirements, and the failure to give any advance warning before an appeal is dismissed, can result in a violation of the due process rights of the alien.
 
 
 29
 Padilla-Agustin v. INS, slip op. at 3934 (9th Cir. April 21, 1994). We stated that the Notice of Appeal form is "misleading and unhelpful," and encourages aliens to think that they "can say enough in the space provided," and that a supplemental, written brief "is not really required." Id. at 3933. We therefore reject the INS's argument that Morgan, by not briefing the voluntary departure issue in his supplemental brief, "waived" his right to have the BIA address it.
 
 
 30
 On the other hand, Morgan has neither asserted that he is of good moral character and thus eligible for voluntary departure, nor sought to demonstrate that the equities are in his favor. See Campos-Granillos v. INS, 12 F.3d 849, 851 (9th Cir.1993) ("Campos-Granillos testified that he would leave the United States voluntarily by the designated date ... [and] that he would try to return to the United States through legal means only and that he 'will not think of' returning illegally. Finally, he testified that he had sufficient funds to finance his departure.").
 
 
 31
 Nonetheless, Morgan appears a likely candidate for voluntary departure.[2] We therefore remand to the BIA with instructions that Morgan's request for voluntary departure be briefed and decided. We will retain jurisdiction over any further petitions in the matter. See id. at 853 (remanding and retaining jurisdiction).
 
 CONCLUSION
 
 32
 We affirm the decision of the BIA denying asylum and withholding of deportation. We vacate the denial of voluntary departure and remand to the BIA with the direction that the parties be allowed to brief the appeal of this issue and that the BIA rule on its merits. The panel retains jurisdiction of any new appeals of this issue.
 
 
 33
 AFFIRMED in part; VACATED and REMANDED in part. Each side to abide its own costs.
 
 
 
 *
 The panel unanimously finds this case suitable for decision without oral argument. Fed.R.App.P. 34(a); 9th Cir.R. 34-4
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Because Morgan has failed to establish a well-founded fear of persecution, he necessarily cannot satisfy the more stringent "clear probability of persecution" showing required for withholding of deportation. Acewicz, 984 F.2d at 1062
 
 
 [2]
 The record contains no indication that Morgan has a criminal record or has engaged in any criminal conduct other than illegally overstaying his visitor's visa. Moreover, Morgan was previously granted voluntary departure by an officer of the INS