

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-24-2006

# Muaddi v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 04-4328

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Muaddi v. Atty Gen USA" (2006). *2006 Decisions.* Paper 1725.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1725

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 04-4328

ADEL YACOUB MUADDI,
Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES

PETITION FOR REVIEW OF A DECISION OF
THE BOARD OF IMMIGRATION APPEALS
Agency No. A95-841-025

Submitted Under Third Circuit LAR 34.1(a)
November 17, 2005

Before: BARRY and AMBRO, <u>Circuit Judges</u>, and POLLAK,* <u>District Judge</u>

(Opinion Filed: January 24, 2006)

OPINION

---

*The Honorable Louis H. Pollak, District Judge, United States District Court for the Eastern District of Pennsylvania, sitting by designation.

**BARRY, Circuit Judge**

Adel Muaddi petitions for review of a final order of removal of the Board of Immigration Appeals ("BIA").  We will deny the petition.

## I.  Background

### A.  Facts

Muaddi is a Christian native of the Israeli-occupied West Bank.[1]  He fled to the United States on September 8, 2001, allegedly to escape politically and religiously motivated violence threatened against him by members of the Palestinian terrorist organization, Hamas.[2]  In May 2001, Muaddi had been working in his auto repair shop in the West Bank city of Ramallah when he allegedly became engaged in a heated political discussion about Israeli-Palestinian violence with a long-time customer named Massar Hmaid.  Muaddi argued that "it was not right to kill innocent people," and Massar Hmaid replied that Christians like Muaddi had "aligned [them]selves with the Jews against Muslims and that all Jews should be killed."  (App. 65.)  Muaddi then forced Massar

---

[1]Formerly a part of Jordan, the West Bank was occupied by Israel after the 1967 War. Today, pursuant to negotiations with Israel, the elected Palestinian Authority exercises some jurisdiction in parts of the West Bank, and is responsible for a range of civil functions, including keeping order.  *See* U.S. Department of State Homepage, Bureau of Consular Affairs, Israel, the West Bank and Gaza,athttp://travel.state.gov/travel/ cis_pa_tw/cis/cis_1064.html (last visited Nov. 12, 2005).

[2]Hamas, an Arabic acronym for the "Islamic Resistance Movement," is on the U.S. State Department's list of Foreign Terrorist Organizations.  *See* U.S. Department of State Homepage, Foreign Terrorist Organizations, *at* http://www.state.gov/s/ct/rls/fs/37191.htm (last visited Nov. 12, 2005).

Hmaid to leave his shop, and upon leaving Massar Hmaid threatened, "You will pay for your conduct. You will pay for kicking me out." (App. 65-66.) Muaddi, who owned his shop since 1996, never had any difficulty with a customer prior to this confrontation.

Approximately two weeks later, Massar Hmaid's cousin Khalid Hmaid appeared at the shop and claimed that Massar Hmaid "had been killed by the Israelis." (App. 66.) Khalid Hmaid threatened Muaddi, and accused him of involvement in the killing. On June 15, 2001, four members of Hamas allegedly ransacked Muaddi's shop, and the next day searched Muaddi's father's home looking for Muaddi. Muaddi was not present at either location, but claims that his assistant witnessed the search of his shop and that his brother's family witnessed the search of his father's home. The four members of Hamas were purportedly looking for Muaddi because Massar Hmaid was also a member of Hamas, something Muaddi claims he only learned upon seeing Massar Hmaid's official Hamas funeral on television.

Muaddi testified that, fearful for his life, he left the West Bank for neighboring Jordan on August 23, 2001, intending to fly to the United States and live with relatives in New Jersey. He arrived in the United States on September 8, 2001 on a passport issued by the Palestinian Authority with a United States Visa he had obtained in Jerusalem on May 8, 2001. Muaddi believed, so he contends, that if forced to go back to the West Bank, he "would be killed by Hamas." (App. 75.)

## B. Procedural History

### 1. Removal Hearing

Muaddi applied for asylum with the Immigration and Naturalization Service ("INS") on August 29, 2002. On January 30, 2003, INS issued him a Notice to Appear before an immigration judge ("IJ") because the period of his authorized stay had expired on March 7, 2002. At his removal hearing on May 22, 2003, Muaddi admitted removability, but requested relief from deportation by applying for (1) asylum, (2) withholding of removal, and (3) relief under the Convention Against Torture ("CAT").

In addition to Muaddi's testimony before the IJ, detailed above, his uncle Sam Muaddi, a United States citizen, testified that his nephew is indeed a Christian and owns an auto repair shop in the West Bank. Additionally, Sam Muaddi stated that he is often in contact with his family in the West Bank, including Muaddi's father, who told him that "the threat to [Muaddi's] life still exists over there." (App. 89.)

To support his claims, Muaddi submitted his Palestinian Authority passport, a letter from a family friend attesting to his good character, an excerpt from an immigration publication, and the U.S. State Department's 2001 Country Report on Human Rights Practices for Israel and the occupied territories ("Country Report"). The Country Report indicates that in 2001, 22 Palestinians living in the occupied territories were killed by other Palestinians for allegedly collaborating with Israel, and that the Palestinian Authority failed to make any arrests in those cases.

4

The IJ rejected Muaddi's applications for asylum, withholding of removal and relief under CAT in an oral decision dated May 22, 2003. First, the IJ determined that Muaddi's testimony indicated that he faced persecution for expressing a political opinion by a "group the Government of the occupied territories and Israel as well has been unable to control." (App. 14.) Nevertheless, the IJ declined to grant Muaddi asylum because he found his testimony incredible, and because of a lack of evidence corroborating the existence of Massar Hmaid and the search and ransacking of Muaddi's shop and his father's home. Second, the IJ ruled that because Muaddi failed to meet the standard for asylum, he also failed to meet the higher standard for withholding of removal. Finally, the IJ rejected Muaddi's application for relief under the CAT because even if Muaddi had a legitimate fear of torture upon his return to the West Bank, it "is at the hands of an individual or a group and that's not the Government." (App. 18.)

## 2. Board of Immigration Appeals Ruling

In an opinion dated October 15, 2004, the BIA dismissed Muaddi's appeal. The BIA declined to evaluate Muaddi's credibility, instead rejecting his claims for lack of corroboration. It stated that Muaddi offered "no explanation for the absence of corroborative evidence" of Massar Hmaid's death and televised funeral, or the ransacking of his shop and his father's home. In light of Muaddi's "frequent contact with his family" in the West Bank, the BIA explained, corroborative documentary evidence should have been reasonably available. (App. 3) Thus, the BIA concluded, Muaddi "did not

5

demonstrate a well-founded fear of future persecution" necessary for asylum, and failed to meet "the higher burdens of proof for withholding of removal and protection pursuant to the [CAT]." (App. 3)

Muaddi filed a timely Petition for Review under 8 U.S.C. § 1252(b)(1). We granted his Motion for a Stay of Removal pending the resolution of his petition.

## II.  Jurisdiction and Standard of Review

We exercise jurisdiction over the final order of removal pursuant to § 242 of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1252(a). Where, as here, the BIA issues its own opinion rather than adopting that of the IJ, we review only the BIA's decision. *Abdulai v. Ashcroft*, 239 F.3d 542, 548-49 (3d Cir. 2001). The BIA's findings of fact will stand so long as they are supported by substantial evidence, which is "more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Abdille v. Ashcroft*, 242 F.3d 477, 483 (3d Cir. 2001) (quoting *Senathirajah v. INS*, 157 F.3d 210, 216 (3d Cir. 1998)). The BIA's findings can only be overturned if "the evidence not only supports a contrary conclusion, but compels it." *Abdille*, 242 F.3d at 483-84.

## III.  Discussion

### A.  The BIA Correctly Denied Muaddi's Asylum Application

An alien who is removable from the United States may avoid deportation by qualifying for a grant of asylum. *Abdulai*, 239 F.3d at 545. The Attorney General has

discretion to grant asylum to an alien determined to be a "refugee": a person unable or unwilling to return to his or her country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group or political opinion . . . ." *Abdille*, 242 F.3d at 482 (quoting 8 U.S.C. §§ 1158(b)(1)(A) and 1101(a)(42)(A)). An asylum applicant bears the burden of proof, *id.* (citing 8 C.F.R. § 208.13(a)), and can demonstrate a "well-founded fear of persecution by showing that she has a genuine fear, and that a reasonable person in her circumstances would fear persecution if returned to her native country." *Gao v. Ashcroft*, 299 F.3d 266, 272 (3d Cir. 2002) (citing *Elnager v. INS*, 930 F.2d 784, 786 (9th Cir. 1991)).

The applicant's burden of proof *may* be satisfied solely by his or her uncorroborated testimony; however, "otherwise-credible applicants may be required, under certain circumstances, to provide corroborating evidence in order to meet their burden of proof." *Mulanga v. Ashcroft*, 349 F.3d 123, 133-34 (3d Cir. 2003) (citing *Abdulai*, 239 F.3d at 554). To determine whether corroboration is required, a court must (1) identify facts for which "it is reasonable to expect corroboration," (2) determine whether the applicant has presented corroborating evidence, and if not, (3) determine whether the "applicant has adequately explained why s/he was unable to do so." *Abdulai*, 239 F.3d at 554 (citing *In re S-M-J-*, 21 I. & N. Dec. 722 (BIA 1997)). If the applicant fails to give an adequate explanation, he has failed to meet his burden of proof. *Mulanga*, 349 F.3d at 134 n.9 (citing *In re S-M-J-*, 21 I. & N. Dec. 722, 725-26).

Here, the BIA's reasoning is slim, but it meets the minimum requirements outlined in *Abdulai*. First, the BIA identified three facts that it would have been reasonable for Muaddi to have corroborated: (1) the existence of Massar Hmaid, (2) the search of Muaddi's home, and (3) the ransacking of Muaddi's shop. Second, the BIA acknowledged the IJ's conclusion that Muaddi's "testimony alone [was] insufficient" to meet his burden of proof for asylum. (App. 3). Third, the BIA rejected Muaddi's argument that he was unable to obtain evidence of Massar Hmaid's Hamas funeral "because the television station was bombed," and explained that Muaddi's failure to produce corroborating evidence was inexcusable because "[t]he respondent's frequent contact with his family indicates that documentary evidence should be readily available." (App. 3.)

The BIA's conclusions are entitled to great deference. The REAL ID Act of 2005, § 101(e), states that "no court shall reverse a determination made by a finder of fact with respect to the availability of corroborating evidence . . . unless the court finds . . . that a reasonable finder of fact is compelled to conclude that such corroborating evidence is unavailable." 8 U.S.C. § 1252(b)(4). A reasonable finder of fact would not be so compelled here. The existence of Massar Hmaid and the search and ransacking of Muaddi's home and shop are central to his alleged fear of future persecution if he were to return to the West Bank. Despite his testimony that Massar Hmaid's funeral was televised, and despite the existence of dozens of Palestinian media outlets, Muaddi can

8

only point to the alleged destruction of one television station as the justification for his inability to provide proof that Massar Hmaid even existed. Even assuming that this justification is adequate, Muaddi presents no reason, compelling or otherwise, why he could not have obtained an affidavit from either his brother or co-worker corroborating his account of the alleged home and/or shop break-ins by Hamas. Muaddi's father and three brothers still live in Ramallah, and his uncle testified that he speaks with Muaddi's father in Ramallah "all the time . . . [a]t least once a month." (App. 88) Generally, it is reasonable to expect corroboration of "facts which are central to [an applicant's] claim and easily subject to verification," *In re S-M-J-*, 21 I. & N. Dec. 722, 725, including "letters from family members remaining in the applicant's home country." *Abdulai*, 239 F.3d at 554.

Muaddi, citing *Mulanga*, 349 F.3d at 136, argues that the BIA erred in not informing him during the master calendar hearing that he would be required to corroborate certain parts of his testimony. In *Mulanga*, we found that the IJ "erred by not alerting [the applicant] during the removal proceedings that the absence of corroboration of" certain facts central to the applicant's testimony "would lead to the denial of her application, thereby giving her an opportunity to explain her inability to corroborate." 349 F.3d at 136.

Although the IJ did not mention corroborating evidence during the master calendar hearing, he did request evidence corroborating the existence and/or death of Massar

Hmaid during the removal hearing, and gave Muaddi an opportunity to explain why he lacked such evidence. And, while the IJ never requested evidence corroborating the ransacking of Muaddi's home and auto shop, any error in this regard was not significant because the absence of corroborating evidence as to Massar Hmaid's very existence in and of itself defeats his asylum claim. Without the confrontation in the shop where Muaddi allegedly expressed his political view that innocent people should not be killed in the Palestinian-Israeli conflict, the later ransacking of his home and shop cannot have caused Muaddi the "well-founded fear of persecution *on account of . . .* political opinion" required for a successful asylum claim. *See* 8 U.S.C. § 1101(a)(42)(A) (emphasis added).

Parenthetically, there is little or no evidence that Muaddi faces future persecution on account of his Christian religious beliefs. Muaddi testified that it was well known that he was Christian, yet from 1996 through 2001 he was not persecuted because of his religious beliefs. Also, many of Muaddi's family members, who are also Christian, still reside in Ramallah and have not been persecuted because of their religious beliefs. If Muaddi faces persecution at all, and he has not shown that he does, it is on account of Massar Hmaid's and Hamas' belief that he supported and collaborated with Israelis—an imputed political belief.[3]

Finally, Muaddi argues that in order to be based on substantial evidence, the BIA

---

[3]It is irrelevant whether Muaddi actually supported or collaborated with the Israelis because "an asylum claim may be based on imputed political opinion." *Johnson v. Gonzales*, 416 F.3d 205, 211 (3d Cir. 2005).

was required to consider the Country Report he submitted. For this proposition, he points to our decision in *Berishaj v. Ashcroft*, 378 F.3d 314, 325 (3d Cir. 2004). In *Berishaj*, we found that because "[a]dverse credibility determinations based on speculation or conjecture, rather than on evidence in the record, are reversible," it was error for the IJ to rule that the applicant's testimony regarding his experience as an ethnic Albanian in the Serbian Army was incredible without addressing an article in the administrative record recounting another soldier's similar experience. *Id*. at 323, 325. *Berishaj* is inapposite here. The BIA expressly declined to address the IJ's finding that Muaddi's testimony was not credible, rejecting his application for lack of corroboration.[4] The Country Report does not address the specific events about which Muaddi testified but only describes general conditions in Israel and the occupied territories and, thus, would not have been helpful to the BIA.

In sum, the BIA's conclusion that Muaddi failed to meet his burden of proof for his asylum application is supported by substantial evidence.

## B. The BIA Correctly Denied Muaddi's Applications for Withholding of Removal and Relief Under the CAT

Muaddi also argues that the BIA "failed to consider" his withholding of removal and CAT claims and erred by simply "dismiss[ing] these claims out of hand." (Pet. Br. at

---

[4]Because our review is limited to the BIA's decision, *Adbulai*, 239 F.3d at 548-49, we do not address Muaddi's argument that the IJ made his adverse credibility finding "based upon speculation, not on the record." (Pet. Br. at 16.)

19.)

An applicant qualifies for withholding of removal by demonstrating a "'clear probability' that, more likely than not, his or her life or freedom would be threatened if s/he is deported." *Mulanga*, 349 F.3d at 132 (citing *Lin v. INS*, 238 F.3d 239, 244 (3d Cir. 2001)). The "more likely than not" standard for withholding of removal is more difficult to satisfy than asylum's "well-founded fear" standard and, thus, one who has failed to qualify for asylum necessarily fails to qualify for withholding of removal. *Id*. Because Muaddi failed to demonstrate a "well-founded fear" of persecution necessary for asylum, the BIA correctly dismissed his withholding of removal claim.

The same is not always true, however, for an applicant's CAT claim. Under the CAT, an applicant can obtain relief from deportation if he or she can show "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." *Id*. (quoting 8 C.F.R. § 208.16(c)(2)). Torture is defined as

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for . . . any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 208.18(a)(1).

The BIA's decision implies that because Muaddi failed to establish a successful asylum claim, his CAT claim fails as well. Unlike withholding of removal, however, a CAT claim is not *automatically* doomed by a related, unsuccessful asylum claim. While

an asylum applicant must demonstrate persecution on account of certain characteristics such as race or religion, a CAT claim "focuses broadly on torture without regard for the reasons for the treatment." *Ramsameachire v. Ashcroft*, 357 F.3d 169, 185 (2d Cir. 2004). Therefore, a CAT claim need only be analyzed separately "when there is evidence that the alien might be tortured for reasons unrelated to her claims for asylum and withholding of removal." *Alemu v. Gonzales*, 403 F.3d 572, 576 (8th Cir. 2005). Because Muaddi has proffered no such evidence here, the BIA's analysis of his asylum claim is applicable to his CAT claim as well. Simply stated, Muaddi failed to demonstrate that it is more likely than not that he will be tortured upon returning to the West Bank.

## IV.  Conclusion

For the foregoing reasons, the petition for review will be denied, and the stay of removal will be vacated.

13